# No. 14-3102

## IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

### ROBERT M. BROWN,

*Plaintiff–Appellee,*

*vs.*

### UNIVERSITY OF KANSAS, et al.,

*Defendants–Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

ERIC F. MELGREN, DISTRICT JUDGE • CASE NO. 10-2606

# APPELLANTS' OPENING BRIEF

**ROBERT M. BROWN**

6200 W 74th STREET

OVERLAND PARK, KS 66204

(913) 384-3269 • FAX (866) 610-4630

**APELLANT** *PRO SE*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. vii

JURISDICTIONAL STATEMENT ......................................................................... 1

STATEMENT OF ISSUES ................................................................................... 3

STATEMENT OF THE CASE .............................................................................. 5

STATEMENT OF FACTS..................................................................................... 6

A.    Brown's Amended Application

...................................................................................................................... 6

B.    Delay by the School of Law

...................................................................................................................... 8

C.    The School of Law's Complaint

...................................................................................................................... 9

D.    The School of Law Insists on Permanent Expulsion

...................................................................................................................... 11

E.    Defendants Manage Brown's Proceedings

...................................................................................................................... 12

F.    Brown's Expulsion

...................................................................................................................... 15

i

## TABLE OF CONTENTS

**Page**

STANDARDS OF REVIEW .................................................................................. 16

SUMMARY OF THE ARGUMENT...................................................................... 18

ARGUMENT ....................................................................................................... 22

I. THE ACTIONS DEFENDANTS TOOK IN ACCEPTING AND
RECOGNIZING A CONTRACTUAL RELATIONSHIP WITH
BROWN BASED ON HIS AMENDED APPLICATION, RE-
ENROLLING BROWN SUBSEQUENT TO HIS AMENDMENT,
COLLECTING BROWN'S TUITION, AND INDUCING BROWN
TO SUPPOSE THAT THE ENROLLMENT CONTRACT WAS
RECOGNIZED GAVE BROWN A LEGITIMATE CLAIM OF
ENTITLEMENT UNDER KANSAS STATE LAW TO A PROPERTY
RIGHT IN HIS ENROLLMENT CONTRACT WITH DEFENDANTS

........................................................................................................................ 22

A. Legal Standard

........................................................................................................... 22

B. Brown's amendment and defendants subsequent actions have
created an unimpeachable contract

........................................................................................................... 26

C. Relief sought

........................................................................................................... 31

## TABLE OF CONTENTS

**Page**

II. IN THE ALTERNATIVE, CREATION AND PUBICATION OF
GOVERNING RULES AND REGULATIONS BY THE KANSAS
BOARD OF REGENTS AND THE UNIVERSITY OF KANSAS
GAVE BROWN A LEGITIMATE CLAIM OF ENTITLEMENT
UNDER KANSAS COMMON LAW AND THE KANSAS
CONSTITUTION TO THE SPECIFIC PROTECTIONS EMBODIED
WITHIN THOSE RULES AND REGULATIONS

.......................................................................................................................... 32

A.    Legal Standard

.......................................................................................................................... 32

B.    What Should Have Happened ............................................................. 34

C.    Defendants had a Duty to Know the Law

.......................................................................................................................... 36

D.    The Protections the Should Have Been Afforded

.......................................................................................................................... 37

E.    Comparison of Defendants' Actions with the Proper Actions

.......................................................................................................................... 39

F.    The limitations of the University's Rules and Regulations created
a legitimate claim of entitlement for Brown in his liberty interest
in the due process protections those rules and regulations afford

.......................................................................................................................... 41

G.    Relief sought

.......................................................................................................................... 43

# TABLE OF CONTENTS

**Page**

III. IN THE ALTERNATIVE, THE DISTRICT COURT ERRED IN ITS
DETERMINATION THAT THE PROCESS PROVIDED WAS
CONSTITUTIONALLY SUFFICIENT

.......................................................................................................................... 43

A. Legal Standard

.......................................................................................................................... 44

B. When the proper balancing test is applied, this case presents much
more compelling reasoning for a formal hearing than *Goss*

.......................................................................................................................... 46

C. The district court erred in finding, for the purposes of this motion,
that defendant Agrawal was an impartial decision maker

.......................................................................................................................... 48

D. The district court erred in finding that the University's failure to
follow its own rules did not give rise to a constitutional violation

.......................................................................................................................... 50

E. Relief sought

.......................................................................................................................... 52

IV. THE DISTRICT COURT ERRED IN LIMITING THE FACTS
CONSIDERED TO ONLY UNCONTROVERTED FACTS

.......................................................................................................................... 52

A. Legal Standard

.......................................................................................................................... 53

## TABLE OF CONTENTS

**Page**

B.    Analysis

...................................................................................................... 53

C.    Relief sought ..................................................................................... 56

V.   THE DISTRICT COURT ERRED IN MAKING DEFINITIVE
FINDINGS OF FACT AT THIS STAGE OF THE PROCEEDINGS
WHERE THERE IS EVIDENCE ON THE NON-MOVING PARTY'S
SIDE OF THE ISSUE

...................................................................................................... 57

A. Legal Standard

...................................................................................................... 57

B. The district court erred in making findings of fact shich should have
been reserved for a jury

...................................................................................................... 57

C. Relief Sought ...................................................................................... 61

VI. THE DISTRICT COURT'S DISMISSAL OF THE BOARD OF
REGENTS FROM THIS ACTION WAS IMPROPER

...................................................................................................... 61

A. Legal Standard

...................................................................................................... 61

B. Analysis ............................................................................................. 62

C. Relief Sought ...................................................................................... 62

# D. TABLE OF CONTENTS

**E. Page**

CONCLUSION ...................................................................................................... 63

CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

................................................................................................................................ 64

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

Salve Regina Coll. V. Russell
  499 U.S. 225 (1991) ................................................................. 16

Anderson v. Liberty Lobby, Inc.
  477 U.S. 242 [106 S. Ct. 2505, 91 L. Ed 2d 202] (1986) ........ 16

Pitman v. Blue Cross & Blue Shield of Okla.
  217 F.3d 1291 (10th Cir. 2000) ................................................ 16

Fischer Imaging Corp. v. Gen. Elec. Co.,
  1887 F.3d 1165 (10th Cir. 1999)............................................... 17

Goss v. Lopez
  419 U.S. 565 (1975) ................................................................. 19

Board of Regents v. Roth
  408 U.S. 564 (1972) ................................................................. 23

Perry v. Sindermann
  408 U.S. 593 (1972) ................................................................. 23

Town of Castle Rock, Colo. V. Gonzales
  545 U.S. 748 (2005) ................................................................. 23

Montero v. Meyer
  13 F.3d 1444 (10th Cir. 1994) .................................................. 32

vii

## TABLE OF AUTHORITIES

**Page**

Wood v. Strickland
420 U.S. 308 (1975) .................................................................. 37

Jones v. Snead
431 F.2d 1115 (8th Cir. 1970) ................................................. 45

Esteban v. Central Missouri State College
415 F.2d 1077 (8th Cir. 1969) ................................................. 45

Dixon v. Alabama State Board of Education
294 F.2d 150 (5th Cir. 1961) ................................................... 45

Edwards v. Board of Regents of Northwest Mo. St. U.
397 F. Supp. 822 (W.D.Mo 07/8/1975) .................................. 45

Goldberg v. Kelly
397 U.S. 254 (1970) ................................................................ 45

Morrisey v. Brewer
408 U.S. 471 (1972) ................................................................ 45

Mathews v. Eldridge
424 U.S. 319 (1976)                                                           46

Trotter v. Regents of the Univ. of New Mexico
219 F.3d 1179 (10th Cir. 2000) .............................................. 50

Board of Curators of Univ. of Mo. v. Horowitz
435 U.S. 78  (1978) ................................................................ 50

# TABLE OF AUTHORITIES

**Page**

Schuler v. Univ. of Minn.
788 F.2d 510 (8th Cir. 1986) ................................................ 57

## State Cases

In re Ketter
268 Kan. 146 (Kan. 1999) ................................................... 6

Matter of Pistotnik
254 Kan. 294 (Kan. 1993) .................................................. 6

O'Neill v. Herrington
317 P.3d 139 (Kan. App. 2014) ........................................... 24

Morse v. Kogle
162 Kan. 558 (Kan. 1947) ................................................... 25

Havens v. Safeway Stores
678 P.2d 625 (Kan. 1984) ................................................... 25

Schiffelbein v. Sisters of Charity Leavenworth
190 Kan. 278 (Kan. 1962) .................................................. 26

Murphy v. Nelson
921 P.2d 1225 (Kan. 1996) ................................................. 34

## Miscellaneous

Restatement (Second) of Contracts § 1 (1981) .......................................................... 24

Restatement (Second) of Contracts § 287(2) (1981) ................................................. 26

## Statement of related cases (10th Cir. R. 28.2(C)(1))

None

## JURISDICTIONAL STATEMENT

Plaintiff Robert M. Brown filed this action against defendants The University of Kansas, Bernadette Gray-Little (named only in her official capacity), Gail Agrawal, Stephen W. Mazza,  Joyce A. McCray-Pearson, Wendy Rohleder-Sook (each current or former employees of the University of Kansas); Jarold Boettcher, Christine Downey-Schmidt, Mildred Edwards, Tim Emert, Ed McKechnie, Janie Perkins, and Gary Sherrer (each a current or former member of the Kansas Board of Regents named only in their official capacity), and Andy Tomkins (President and CEO of the Kansas Board of Regents named only in his official capacity), in the United States District Court for the District of Kansas. (RI, *Plaintiff's Complaint* dated 11/9/2010, docket number 1, at 1.) In this brief, I generally refer to the Plaintiff (myself) as "Brown." I refer to the group of defendants as "Defendants."

The district court acquired subject matter jurisdiction under 28 U.S.C. § 1331 because this case deals with a federal question under the Constitution of the United States, and under 28 U.S.C. § 1367 because this case involves supplemental claims under Kansas state law. (RI, *Plaintiff's Complaint* dated 11/9/2010, docket number 1,

at 1.)

This court has jurisdiction under 28 U.S.C. §§ 1291 and 1294(1). On April 18, 2014, the district court entered a final judgment resolving all claims brought by all parties to the action. (RI, *Judgment* dated 4/18/2014, docket number 189.) Brown timely filed a notice of appeal on May 14, 2014. (RI, *Notice of Appeal* dated 5/14/2014, docket number 190.)

## STATEMENT OF ISSUES

This appeal presents the following five issues:

1.      Whether actions which defendants undertook freely and of their own accord recognizing Brown's enrollment contract and inducing Brown to suppose that the enrollment contract was recognized, after defendants had received Brown's amended application and with full knowledge of their rights and of all the material facts, gave Brown a legitimate claim of entitlement under Kansas common law to a property interest in his enrollment contract based on his amended application.

2.      Whether creation and publication of governing rules and regulations by the Kansas Board of Regents and the University of Kansas, admittedly a State Agency, gave Brown a legitimate claim of entitlement under Kansas common law and the Kansas constitution to the specific protections embodied within those regulations.

3.      Whether, if Brown is NOT entitled to the protections of Kansas Common law regarding contracts or the protections of Kansas Common law and the Kansas Constitution regarding state agency regulations, the procedures accorded in this case

3

met with minimum standards of due process.

4.      Whether Brown is entitled to consideration of his factual assertions even if they are controverted by Defendants.

5.      Whether the District Court can make definitive findings of fact at this stage of the proceedings regarding questions of fact where there is evidence on the non-moving party's side of the issue.

6.      Whether the District Court's dismissal of the Board of Regents from this action was proper.

4

## STATEMENT OF THE CASE

This case stems from the permanent expulsion of plaintiff Robert Brown after his amended application. The University of Kansas School of Law started out offering due process protections through its Dispute Resolution Procedure, but when the DRP hearing panel dismissed the complaint due to improper jurisdiction at the Law School Unit Level, Dean Agrawal simply dismissed Brown from the school of law. No hearing was afforded with respect to this permanent expulsion which will forever keep Brown from attending any AALS accredited school of law in America and effectively end any hopes he will ever have of becoming an attorney.

Brown sued pursuant to 42 USC 1983, with pendent state claims for Gross and Wanton Negligence, Tortious Interference, and Civil Conspiracy.

The district court granted complete summary judgment against Brown on all counts. Interestingly, the district court failed entirely to specifically address any of Brown's facts as well as the great majority of his arguments.

This case raises interesting questions regarding property and liberty interests as legitimate entitlements created by Kansas State law.

## STATEMENT OF FACTS

### A. Brown's Amended Application

At the age of 48, plaintiff Robert Brown decided to risk it all and change careers. He set out to become a lawyer. Brown had had a troubled past and had a prior criminal record, but had no convictions less than 13 years old at the time of his application.

Based on consultation with attorneys known to him as well as his own legal research, Brown discovered that the Kansas Bar would not consider transgressions older than 7 years in making determinations regarding discipline, and that therefore his convictions were too remote in time to be relevant to the Kansas Bar. This reliance was based in large part on two cases; *In re Ketter*, 268 Kan. 146 (1999) and *Matter of Pistotnik*, 254 Kan. 294 (1993). (*See* RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated:

6

10/8/2013, Attach #: 7, EX S - Mazza Dep Ex 8 - Brown Procedural Objections, pp. 7-8)

Based upon this research and belief, Brown concluded that his prior convictions were too remote to be relevant on his law school application. Brown was wrong. During the first three days of Law School, speeches from Dean Wendy Rohleder-Sook and Kansas Clerk Carol Green made clear that the school of law expects to see everything on the criminal record listed on a law school student's application. Brown amended his application within the first seven days of his matriculation to disclose his prior criminal record. (See RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 7, SF ¶¶ 24-25.)

In retrospect, Brown does not defend the decision not to disclose. The belief that his convictions were too remote to be relevant was overly hopeful and probably just plain stupid. But Brown was not alone in taking this approach. Dean Rohleder-Sook would later state in deposition that the University of Kansas School of Law receives between 10 and 20 amended applications per year. (See RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to

Dismiss, Dated: 10/8/2013, Attach #: 25, EX AK - Rohleder Sook Deposition, 16:20-17:11)   Extrapolated over the history of the School of Law, this would amount to hundreds of amended applications.

## B. Delay by the School of Law

After Brown amended, the School of Law asked him for a written statement, additional clarifications regarding arrests that had resulted in dropped charges, and a release form so that they could obtain his comprehensive file from the Johnson County District Attorney.   Brown cooperated.   His last contact with the School of Law regarding research into his amended application occurred on October 7, 2009.   (*See* RIV, Docket# 170, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 1, EX AL – EXCERPTS FROM DEFS BATES, doc labeled [Defs.' Bates Brown, Robert v. KU, et al 000094]).   At this point, of course, the School of Law had every right to dismiss Brown and send him on his way.   The tuition deadline for the Fall of 2009 had not yet arrived.   Brown could simply have moved on and learned from his mistake.

But Brown heard nothing more regarding his amended application. His

tuition for the Fall Semester of 2009, and then for the Spring Semester of 2010 was

collected from a student loan. Brown sat for finals in the Fall of 2009, and was

academically successful. (RI, *Pretrial Order* dated 6/18/2013, docket number 144,

at 16, SF ¶ 63.)(UNCONTROVERTED) Brown was also automatically enrolled

in the Spring, 2010 semester, and began matriculation. (RII, Exhibits in Support

of Plaintiff's Response to Motion to Dismiss dated 10/8/2013, docket number

167, Attachment #10, EX K, Page 3-4, ¶¶ 16-17.) By this time, Brown had

incurred more than $20,000 in student loan debt and had expended in excess of

$15,000 in tuition that could never be refunded. (RI, Pretrial Order dated

6/18/2013, docket number 144, at 40.) Additionally he had devoted nearly five

months of full time work effort to the School of Law.

## C. The School of Law's Complaint

On February 23, 2010, Dean Mazza summoned Brown to his office to

serve him with a complaint pursuant to the School of Law's Dispute Resolution

Procedure. (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to

Motion to Dismiss, Dated: 10/8/2013, Attach #: 2, EX N - Mazza Dep Ex 2 -

Complaint). At this time, Mazza explained that the school of law was seeking

his permanent expulsion, but that he would have access to due process of law by

way of the School of Law's Dispute Resolution Procedure. (RIII, Docket# 168,

Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated:

10/8/2013, Attach #: 1, EX M - Mazza Dep Ex 1 - DRP)

Brown, troubled that the School of Law had let so much time go by and

so much money be wasted before informing him that they sought his permanent

removal, filed procedural objections noting that he felt the School of Law's

claims were now precluded by Kansas Common Law of Contracts regarding

estoppel, reliance, and recission. (RIII, Docket# 168, Exhibits in Support of

Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 7, EX S

- Mazza Dep Ex 8 - Brown Procedural Objections)

Pursuant to University Regulations, it was Dean Mazza's job to assemble

a hearing panel upon receipt of the written complaint, but Mazza did not identify

the panel until April 14th, very shortly before finals for the Spring 2010 semester.

(RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 1, EX M - Mazza Dep Ex 1 – DRP, Section 5); (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 9, SF ¶ 34.)(UNCONTROVERTED); (RIV, Docket# 170, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 1, EX AL – EXCERPTS FROM DEFS BATES, doc labeled [Defs.' Bates Brown v. KU 000800])

On April 18th, 2010, in private email communications with Dean Rohleder-Sook, Dean Mazza characterized dealing with Brown as "a nightmare". (RIV, Docket# 170, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 1, EX AL – EXCERPTS FROM DEFS BATES, doc labeled [Defs.' Bates Brown v. KU 000375])

### D. The School of Law Insists on permanent expulsion

The School of Law Ombuds, Sandra Craig McKenzie, went before Dean Mazza and Rohleder-Sook after speaking with Brown to recommend that his expulsion not be pursued, but Mazza was unwilling to consider any type of

11

mediation. (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 23, EX AI - McKenzie Deposition at 61:18-23; 66:12-20)

### E. Defendants' Manage Brown's Proceedings

On April 19th, 2010, Rohleder-Sook placed a response to Brown's procedural objections in his School of Law mailbox, bearing her name as the author. (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 10, EX V - Mazza Dep Ex 16 - Rohleder Sook Response to Proc Obj)

It later came to light that the response to Brown's procedural objections had actually been prepared by Dean Mazza. (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 22, EX AH - Mazza Deposition - Vol 2 at 180:9-16)

After Brown's April 20, 2010 contact with Ombuds McKenzie, he studied and sat for his finals for the Spring Semester of 2010, and heard no more

regarding the complaint until he received defendant Agrawal's May 26th, 2010

letter of pending dismissal 37 days later. (RIII, Docket# 168, Exhibits in Support

of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 11,

EX W - Mazza Dep Ex 18 - Agrawal Letter of Intent to Dismiss)

Realizing that Jurisdiction had been hijacked by the Dean and that the

actions being taken were improper within the structure of the University's rules

and regulations, Brown filed two requests with the University Judicial Board. In

his requests, he raised questions of improper jurisdiction. (RIII, Docket# 168,

Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated:

10/8/2013, Attach #: 14, EX Z - McCray Dep Ex 27 - Request for Initial Hearing)

(RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to

Dismiss, Dated: 10/8/2013, Attach #: 15, EX AA - McCray Dep Ex 28 - Request

for Jurisdictional Ruling) According to the University Senate Code, this should

have triggered immediate scrutiny by the Office of University Governance and

if necessary, the Senate Executive Committee to determine proper jurisdiction.

(RII, Docket# 167, Exhibits in Support of Plaintiff's Response to Motion to

Dismiss, Dated: 10/8/2013, Attach #: 9, EX J - University Senate Code – Conflict Resolution Procedure at top of Page 1).

Instead, Gail Agrawal, in a May 31st, 2010 email, Agrawal, instructed general counsel to craft Joyce McCray-Pearson's response to Brown's requests for action before the judicial board. In response, general counsel informed Agrawal that they would "formulate a strategy to deal with this issue." (RIV, Docket# 170, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 1, EX AL – EXCERPTS FROM DEFS BATES, doc labeled [Defs.' Bates Brown v. KU - - Revised Redactions 000630]) McCray pearson immediately responded that the Judicial Board had no jurisdiction, and the conflict resolution procedures of the University Senate Code were ignored, allowing Agrawal to retain control of the matter. (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 4, EX P - Mazza Dep Ex 4 - Joyce McCray Pearson Letter Denying Jurisdiction) Brown then requested a face to face meeting with Agrawal, which she denied stating simply "I see no need to meet with you, and therefore decline

your request for a meeting." (See RI, *Pretrial Order* dated 6/18/2013, docket
number 144, at 10, SF ¶ 41.)

## F. Brown's Expulsion

On June 7, 2010, Dean Agrawal permanently expelled Brown, who was
the first student in the history of the University of Kansas School of Law ever to
be permanently expelled for *any* reason. (RIII, Docket# 168, Exhibits in Support
of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 9, EX
U - Mazza Dep Ex 10 - Agrawal Dismissal Letter) (RI, *Pretrial Order* dated
6/18/2013, docket number 144, at 13, SF ¶ 48.)(UNCONTROVERTED)

This action followed.

## STANDARDS OF REVIEW

1.      Brown's claims regarding the applicability of state common and constitutional law regarding contracts and administrative regulations are governed by Kansas law. This court reviews de novo the district court's assessment of state law. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991).

2.      "Summary judgment orders are reviewed de novo, using the same standards as applied by the district court." *Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1295 (10th Cir. 2000). Summary judgment is appropriate only if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The movant has the burden of showing that there is no genuine issue of fact . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The non-moving party "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Id.* at 256-57. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

3.      To the extent that a district court order denies a party's right to a

jury trial under the Seventh Amendment, this Court reviews that order de novo.

*Fischer Imaging Corp. v. Gen. Elec. Co.,* 187 F.3d 1165, 1168 (10th Cir. 1999).

## SUMMARY OF THE ARGUMENT

1.      The district court ignored entirely Brown's argument and authorities regarding the applicability of Kansas common law regarding contracts with respect to this case. Kansas common law vested in Brown a legitimate claim of entitlement with respect to his enrollment contract based upon his amended application. At the time Defendants accepted that application by re-enrolling Brown for the Spring 2010, Summer 2010, and Fall 2010 semesters, they had full knowledge of every allegation upon which Brown's subsequent dismissal was based. Under Kansas common law regarding contracts, in so doing Defendants surrendered their right to later dismiss Brown.

2.      In the alternative, if Brown is not entitled to the protections Kansas common law regarding contracts affords to his enrollment contract with Defendants, he is at least entitled to a hearing that meets with the standards Defendants state agency rules and regulations set forth for disciplinary proceedings in which a student's status is placed in jeopardy. No one has suggested here that those rules were followed. It is uncontroverted that they simply were not. Kansas common law provides that when a Kansas state agency does not follow its own rules and regulations, then its actions are

unlawful. Further, the rules and regulations in question have been adopted as the University's governing rules by the Kansas Board of Regents – the State's constitutionally appointed authority for governance of State Universities. The district Court ignored entirely Brown's arguments and authorities on this issue, but it is clear that Kansas common and constitutional law vest in Brown a legitimate claim of entitlement to the procedures of the University in this case.

3. In the alternative, if Brown is entitled to neither the protections of Kansas common law regarding contracts nor the protections of Kansas common law and constitutional protections regarding the state agency regulations at issue, the district court erred in its determination that due process was afforded to Brown even entirely absent these protections. There was clear error for several reasons:

> a. The Court ignored the *Goss* court's specific qualification of its holding "to the short suspension, not exceeding 10 days" and its pre-emptive warning that "longer suspensions for the remainder of the school term, or permanently, may require more formal procedures." *Goss v. Lopez*, 419 US 565, 584 (1975). This is a permanent suspension not only from the University of Kansas School of Law, but any AALS accredited

19

School of Law in the entire country. By virtue of this harsh penalty,

it is also an effective exclusion for a lifetime from ever practicing law

in the United States. Clearly, more extensive process is required here

than was required in *Goss*.

b.  The Court ignored Brown's statements of fact, supported by the record,

that indicated Agrawal was not an impartial decision maker.

c.  The court based its findings that Universities as a general rule need not

follow their own rules on three cases, all of which involved failure of a

student to meet published academic standards. These cases are not on

point, because no hearing is required for academic dismissals. They do

not control in this situation.

4.  The district court erred in failing to treat any of Brown's facts as relevant

or true, even when supported by the record. The district court stated "Plaintiff's facts

are frequently not supported by competent evidence", but failed to give even one discrete

example of such a fact. The district court then took the extraordinary measure of

presenting only the uncontroverted, material facts that were supported by admissible

evidence. Not a single one of Brown's three hundred and twenty-one additional

20

statements of fact made the list, even to the extent they were not controverted. This treatment ignores the preference which is to be given to the non-moving party's facts when they have support in the record, and is clear error.

5.    The district court also erred in in making numerous determinations of fact which were dispositive of Brown's claims despite the fact that there was evidence in the record which created material issues of fact with respect to the Court's findings, and despite the fact that a Jury trial had been requested. In addition to being procedurally improper, this approach denied Brown his seventh amendment right to trial by a jury.

6.    Finally, the district court ignored completely Brown's argument that the Board of Regents was a proper defendant per Kansas statutory law.

## ARGUMENT

### I.

**THE ACTIONS DEFENDANTS TOOK IN ACCEPTING AND RECOGNIZING A CONTRACTUAL RELATIONSHIP WITH BROWN BASED ON HIS AMENDED APPLICATION, RE-ENROLLING BROWN SUBSEQUENT TO HIS AMENDMENT, COLLECTING BROWN'S TUITION, AND INDUCING BROWN TO SUPPOSE THAT THE ENROLLMENT CONTACT WAS RECOGNIZED, GAVE BROWN A LEGITIMATE CLAIM OF ENTITLEMENT UNDER KANSAS STATE LAW TO A PROPERTY RIGHT IN HIS ENROLLMENT CONTRACT WITH DEFENDANTS.**

## A. Legal Standard

"To have a property interest in a benefit, a person [] must [] have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims. Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support

22

claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)

Property rights may also arise from contract law, and "absence of [] an explicit contractual provision may not always foreclose the possibility [of] a "property" interest[]. For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.' 3 A. Corbin on Contracts §§ 561-572A (1960). Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.' Id., at § 562." *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972)

In circumstances where interests arising from common law or contract are more closely tailored to the situation in question, the Court has given these interests more weight that those arising out of statute. (*See Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, Syl. at (d) (2005) – "[The] alleged interest stems not from common law or contract, but only from a State's statutory scheme.")

23

The formation of a contract requires only "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty". Second Restatement of Contracts § 1.

In Kansas, the essential elements of a valid informal contract are: (a) A promisor and a promisee, each with legal capacity to act as such in the proposed contract; (b) manifestation of assent by the parties who form the contract to the terms thereof and by every promisor to the consideration for his or her promise; (c) a sufficient consideration; and (d) that the transaction, though satisfying the foregoing requirements, must be one that is not void by statute or by special rules of the common law. *O'Neill v. Herrington*, 317 P.3d 139, Syl. At 1 (Kan. App. 2014)

In Kansas, one who claims fraud in a contract process must act quickly after discovery of the alleged fraud.

1. One who seeks to rescind a contract on the grounds of fraud must do so with reasonable promptness after discovery of the fraud.
2. If, after discovery or knowledge of facts which would entitle a party to a contract to rescind the contract, he treats the contract as binding and leads the other party to believe that the contract is still in effect, he will have waived his right to rescind.
3. In order to constitute such a waiver, it is not necessary that there be an express ratification of the contract after discovery of the fraud which

> might make the equitable remedy of rescission available. Acts or
> conduct inconsistent with an intention to rescind it, or in recognition of
> the contract, may have the effect of affirming it.

*Morse v. Kogle*, 162 Kan. 558, Syl. at 1-3 (1947)

When an agreement is not an integrated agreement, an organization's published

Rules, Regulations, and other literature and custom can be used in Kansas to help

determine the intent and extent of the contract. *Havens v. Safeway Stores*, 678 P.2d

625, 629 (Kan. 1984) ("Custom and usage may be shown to elucidate or explain

something ambiguous in a contract[.]" ) *See* also Second Restatement of Contracts §

90(1) ("A promise which the promisor should reasonably expect to induce action or

forbearance on the part of the promisee or a third person and which does induce such

action or forbearance is binding if injustice can be avoided only by enforcement of the

promise.")

Under Kansas common law of contracts, a party to a contract claiming to have

been defrauded may not continue to benefit under the contract, or act as though it is

still in force, or induce the other party to the contract to believe that it is still in force.

Doing so constitutes acquiescence in the contract.

Whether the principle is described as equitable estoppel, quasi estoppel, waiver,

25

ratification, election, or as a requirement of consistency in conduct, is not very important. The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced .... The rule is well recognized that where a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and of all the material facts remains inactive for a considerable time or abstains from impeaching a contract or transaction, or freely does what amounts to a recognition thereof as existing, or acts in a manner inconsistent with its repudiation and so as to affect or interfere with the relation and situation of the parties, so that the other party is induced to suppose that it is recognized, this amounts to acquiescence and the transaction, although originally impeachable, becomes unimpeachable.

*Schiffelbein v. Sisters of Charity of Leavenworth*, 190 Kan. 278, 281-2 (1962)

If a party, knowing of an alteration that discharges his duty, asserts a right under the original contract or otherwise manifests a willingness to remain subject to the original contract or to forgive the alteration, the original contract is revived.

Second Restatement of Contracts § 287(2)

## B. Brown's amendment and defendants' subsequent actions have created an unimpeachable contract

At the time of submission of his application to the School of Law, Brown had

mistakenly determined that his prior convictions (the most recent occurring

approximately 13 years prior) were too remote to be relevant based upon his research

regarding the current state of Kansas Case law regarding bar admissions, which

indicated that any conviction more than seven years old was too remote to be

considered by the Bar examiners. (RII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss* dated 10/8/2013, docket number 167, Attachment #10, EX K, Page 2, ¶¶ 10-11.) During Brown's first week of matriculation at the University of Kansas School of Law, Defendant Rohleder-Sook and speaker Carol Green clarified that no transgression was too remote in time. (RII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss* dated 10/8/2013, docket number 167, Attachment #10, EX K, Page 2-3, ¶ 12.) Brown came forward and amended his application seven days after he began matriculation at the University Of Kansas School Of Law. (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 7, SF ¶¶ 24-25.)(UNCONTROVERTED) In his amendment, Brown disclosed every non-traffic and non-pet related charge which had ever been adjudicated against him, whether by conviction, diversion, or plea bargain. (RII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss* dated 10/8/2013, docket number 167, Attachment #10, EX K, Page 3, ¶ 13.) Brown cooperated with requests for additional information from the School of Law. (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 7, SF ¶¶ 26-30.)(UNCONTROVERTED)

Brown's last contact with Defendants regarding the information in his amended application was on October 7, 2009. (RII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss* dated 10/8/2013, docket number 167, Attachment #10, EX K, Page 3, ¶ 16.) Between October 7, 2009 and February of 2010, Brown was allowed to sit for his finals and received grades in all his courses. Brown was automatically enrolled for the Spring 2010 semester and his tuition for that semester automatically collected from a student loan by defendant Rohleder-Sook's office without the requirement of so much as a mouse click on Brown's part. During this time frame, Brown was never given any indication that his status as a student was in jeopardy, or that his removal was being sought until his February 23rd, 2010 meeting with defendant Mazza. (RII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss* dated 10/8/2013, docket number 167, Attachment #10, EX K, Page 3-4, ¶¶ 16-17.)

Brown's August 27, 2009 amendment came 50 days before the October 15, 2009 due date of tuition for the fall 2009 Semester. This would be a much different case if the school of law had simply cancelled Brown's enrollment at the time he

amended, and Defendants had ample time to do so. Instead, they allowed Brown to continue to devote his full productive effort to matriculation at the school of law for the next four and a half months. During this time, both his Fall 2009 and his Spring 2010 tuition along with related fees for each semester totaling $15,883.84 were collected and permanently retained by Defendants. (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 40.) Further, in order to finance his legal education during this time, Brown incurred Student loan debt in excess of $20,000. (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 39.)

When Defendants allowed Brown to sit for finals in the Fall semester of 2009 and re-enrolled Brown for the Spring of 2010, they did so with full knowledge of every fact they later claimed as a subsequent ground for dismissal. Defendants accepted Brown's amended application. They collected significant consideration (in excess of $15,000) with no offer for refund. With full knowledge of their right to simply rescind and void Brown's enrollment, Defendants remained inactive for a considerable time during which they abstained from impeaching the transaction. Defendants' re-enrollment of Brown and their issuance of grades to him were both

29

consistent with recognition of his enrollment contract and were inconsistent with its repudiation, and they induced Brown to suppose that his amended application had been accepted. This constituted acquiescence in the contract by Defendants, and the contract, although originally impeachable, became unimpeachable. *Schiffelbein v. Sisters of Charity of Leavenworth*, 190 Kan. 278, 281-2 (1962)   Knowing of an alteration that discharged their duty, Defendants asserted a right under the original contract (the right to Brown's money) and through re-enrollment of Brown, manifested a willingness to remain subject to the original contract and to forgive the alteration. The original contract was revived. Second Restatement of Contracts § 287(2).

Brown's enrollment contract based on his amended application created a legitimate claim of entitlement to the protections of Kansas common law and the benefits of that contract. *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972). The nuances of Brown's enrollment contract with the University of Kansas were explained by the University's policies, procedures and regulations.   *Havens v. Safeway Stores*, 678 P.2d 625, 629 (Kan. 1984).

## C. Relief sought

The ultimate relief sought here is reinstatement of the contract and protection of Brown's property interest in the contract. Since Defendants were aware of every alleged wrong upon which they based Brown's dismissal at the time they acquiesced in the enrollment contract, they cannot now claim that more due process or a hearing would resolve the issue. Brown's amended application has been accepted. Even to the extent the University's policies and procedures provide for further due process, they are superseded by Kansas common law of contracts. (RIII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss* dated 10/8/2013, docket number 168, Attachment #6, EX R, Page 15, § 6.1.6 - ("The provisions of these procedures shall be superseded by any contrary provision of state or federal law.")) Brown should be allowed to resume matriculation at the University of Kansas School of Law with full credit for all past courses. Any continued or new disciplinary action should be based upon circumstances not known at the time of Brown's re-enrollment and the collection of his tuition. The immediate relief sought is reversal of summary judgment based upon these grounds.

## II.

**IN THE ALTERNATIVE, IF BROWN IS NOT ENTITLED TO THE PROTECTION OF HIS STATE LAW CONTRACTUAL PROPERY INTEREST, CREATION AND PUBLICATION OF GOVERNING RULES AND REGULATIONS BY THE KANSAS BOARD OF REGENTS AND THE UNIVERSITY OF KANSAS GAVE BROWN A LEGITIMATE CLAIM OF ENTITLEMENT UNDER KANSAS COMMON LAW AND THE KANSAS CONSTITUTION TO THE SPECIFIC PROTECTIONS EMBODIED WITHIN THOSE RULES AND REGULATIONS**

## A.    Legal Standard

State law creates rules or understandings that secure certain benefits, and that give rise to legitimate claims of entitlement.    *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)

By placing limits on official discretion, a state can also create a liberty interest through its laws. "[A] state creates a protected liberty interest by placing substantive limitations on official discretion.    These substantive limitations work to create the legitimate claim of entitlement giving rise to a constitutional right." *Montero v. Meyer*, 13 F.3d 1444, 1448 (10th Cir. 1994)(Citations and punctuation omitted)

In Kansas, the Board of Regents is a constitutional, rather than legislative

creation. The Kansas Board of Regents is the state's definitive source of supervision

and control of state universities.

> "The legislature shall provide for a state board of regents
> and for its control and supervision of public institutions of
> higher education. Public institutions of higher education
> shall include universities and colleges granting
> baccalaureate or postbaccalaureate degrees and such other
> institutions and educational interests as may be provided by
> law. The state board of regents shall perform such other
> duties as may be prescribed by law."

> Kansas Consitution, Aricle 6, Section 2(b)

On March 20, 1969, the Kansas Board of Regents approved the University

Senate Code of the University of Kansas, chartered all the appropriate governing

bodies listed therein, and decreed that the University Senate Code and its supporting

regulations would serve as the University's official rules and regulations. In concert

with this approval, the Board of Regents rescinded the prior infrastructure of University

Governance. (RIII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*

dated 10/8/2013, docket number 168, Attachment #5, EX Q, Page 3, Preamble)

Kansas is more particular than most states in creating limits on administrative

decision makers. When a state agency violates its own rules and regulations, that state

agency violates Kansas law.

> (1) [agency] regulations properly issued have the force and effect
> of laws, citing Carpenter v. Johnson, 231 Kan. 783, 789, 649 P.2d
> 400 (1982);
> (2) agency regulations are issued for the benefit of both the agency
> and the public and an agency must be held to the terms of its
> regulations, citing United States v. 2,116 Boxes of Boned Beef,
> 516 F. Supp. 321, 348 (D. Kan. 1981);
> and (3) as a general rule an administrative agency may not violate
> or ignore its own rules, and where it fails to follow the rules which
> it has promulgated, its orders are unlawful, again citing Kansas
> Commission on Civil Rights, 212 Kan. 398, Syl. ¶ 1.

*Murphy v. Nelson*, 260 Kan. 589, 595, 921 P. 2d 1225 (1996)

## B.   What Should Have Happened

Even excluding theories of Federal Due Process of Law and State Contract
Law, the School of Law's options in this case were very clearly defined within the
University Senate Code, the University Senate Rules and Regulations, and the
Student Code of Rights and Responsibilities, and they were mandatory, not optional
for the defendants in this case.

Per defendant Agrawal, Brown stood accused of (and was ultimately
dismissed for) "falsification, misrepresentation, and failure to supply required
information on [his] application to the School of Law." (RIII, Docket# 168, *Exhibits*

34

*in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 11, EX W - Mazza Dep Ex 18 - Agrawal Letter of Intent to Dismiss, Page 4). That transgression is described in Article 22(C) of the Code of Student Rights and Responsibilities, which states "An offense against the orderly process of the university is committed when [a] student or applicant knowingly furnishes false or misleading information to the University." (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 3, EX O - Mazza Dep Ex 3 - Code of Student Rights and Responsibilities, Art. 22 (C)(2))  In summary, Brown was charged with an offense described as a type of non-academic misconduct within the Code of Student Rights and Responsibilities.

Disputes involving alleged violations by a student of the Code of Student Rights and Responsibilities which constitute nonacademic misconduct fall under the jurisdiction of the Vice Provost for Student Success, and are administered pursuant to the procedures of the Office of the Vice Provost for Student Success (now called the Vice Provost of Student Affairs). ((RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 6, EX R - Mazza Dep Ex 7 - University Senate Rules and Regs, Section 6.4.9.1)

Article 22 (F)(1) of the Code of Student Rights and Responsibilities provides that "[a] student or organization alleged to have violated provisions of Article 22 is entitled to a hearing in accordance with procedures established by the Office of the Vice Provost for Student Success. Any appeal from such a hearing shall be directed

to the University Judicial Board." (RIII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss* dated 10/8/2013, docket number 168, Attachment #3, EX O, Code of Student Rights and Responsibilities, Art. 22 (F)(1)).

Upon learning of Brown's transgressions, then, the School of Law should have filed a complaint with the Office of the Vice Provost for Student Success. That is the arm of University Governance within the University Community which has exclusive jurisdiction over such matters, and that is the arm of University Governance whose procedures must be followed when such an issue arises.

University Senate Code, Art. XIV, Section 2 provides procedural due process guarantees for every member of the University Community who is involved in a grievance or dispute. (RIII, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss* dated 10/8/2013, docket number 168, Attachment #5, EX Q, University Senate Code, Art. XIV, Section 2).

## C. Defendants had a Duty to Know the Law

Knowledge of and compliance with the University's rules and regulations is Defendants' legal duty. The United States Supreme Court has created a special standard for those public workers who take charge of decisions which have implications regarding the constitutional rights of students - they have a duty to know what those constitutional rights are.

The official himself must be acting sincerely and with a belief that he

36

is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, [a person] who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. Such a standard imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system.

*Wood v. Strickland*, 420 U.S. 308, 321-22 (1975) (Emphasis Added)

## D.    The Protections that Should Have Been Afforded

University Senate Code, Art. XIV, Section 2 provides procedural due process

guarantees for every member of the University Community who is involved in a

grievance or dispute.  Those rights include:

- a) A hearing before a disinterested panel. Specific procedures for each type of grievance or complaint that is within the jurisdiction of an established University body are set forth in this Code.
- b) Each party to a proceeding may represent itself or be represented by an advisor or counsel of his, her, or its choice.
- c) The right to a written statement of the complaint or grievance against him or her, which statement shall set forth with particularity the facts upon which the complaint or grievance is based and shall indicate the provision or provisions of the University Rules and Regulations alleged to have been violated.
- e) The right to introduce into evidence all relevant testimony and documents, and to a full examination of the evidence presented by the other parties,

including the opportunity to cross-examine witnesses. The hearing body shall base its recommendations solely on the evidence received at the hearing.

f) In any hearing or appeal, the parties are entitled to a decision based upon the record of the hearing or appeal.

i) Where the procedures provide for an appeal beyond the hearing, a party aggrieved by a decision of the hearing body shall be entitled to appeal in accordance with such procedures.

j) In all proceedings, the party supporting the application of sanctions to individual members of the University community shall have the burden of persuading the hearing body of the facts upon which the application of such sanctions must be based.

USC Art. XIV protections extend to procedures within every jurisdiction of the University. (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 5, EX Q - Mazza Dep Ex 6 - University Senate Code, Art. XIV, § 2 (Procedural Guarantees))

The Student Code of Rights and Responsibilities also affords specific procedural limitations regarding how the University may proceed whenever a student's status is placed in jeopardy for non-academic reasons:

> Article 2(E). Students will be exempt from disciplinary action that affects their status as students except for academic failure or violation of a published Student Senate, University Senate, University or Regents rule or regulation. Rules and regulations shall be fully and clearly disclosed in advance of the supposed violations.

> Article 2(F). No disciplinary sanctions resulting from a violation of rules and regulations, under Article 2(E), may be imposed upon any student without prior written notice of the nature and cause of the charges, and an opportunity to be heard at a fair hearing. A fair hearing shall include confrontation of witnesses against him or her and the assistance of a person of his or her own assistance or with

> the prior approval of the Office of the Vice Provost for Student Success, up to three persons of the student's choosing.
>
> (RIII, Docket# 168, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 3, EX O - Mazza Dep. Ex 3 - Code of Student Rights and Responsibilities, Articles 2(E) – 2(F))

There can be no mistake that within the University of Kansas student community in situations involving non-academic misconduct, the accused is entitled to be informed of the specific charge against him and has significant procedural rights.

## E.   Comparison of Defendants' Actions with the Proper Actions

Although jurisdiction was improper within the School of Law, Defendants chose to offer due process  pursuant to the School of Law's Dispute Resolution Procedure.   (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 9, SF ¶34.)(UNCONTROVERTED); (RIII, Docket# 168, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 2, EX N - Mazza Dep Ex 2 - Complaint)

Although jurisdictionally improper, the process promised would have afforded numerous due process protections to Brown, including:

39

    (a)  The Dispute Resolution Procedures shall be applied so as to protect the due process and other rights of parties to the dispute.

    (b)  Parties to the dispute shall receive reasonable notice of any charges or allegations against them, of the time and place of any hearing, and of the material issues to be determined.

    (c)  With due regard for the authority of the hearing body to exclude irrelevant, immaterial, cumulative or improper evidence, parties to the dispute shall have a full and fair opportunity to present their version of events, present and cross examine witnesses, or otherwise plead their case, and may be represented by counsel at their own expense.

    (d)  Parties to the dispute are entitled to a decision by an impartial hearing body based upon the record of the proceedings.

(RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 13-14, SF ¶54.)(UNCONTROVERTED); (RIII, Docket# 168, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 1, EX M - Mazza Dep Ex 1 - DRP)

When this process failed to produce a sufficiently prosecutorial result and the

School of Law's complaint under the Dispute Resolution Procedure was dismissed

by the hearing panel, Defendants chose to dismiss Brown by written notification.

(RIII, Docket# 168, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*,

Dated: 10/8/2013, Attach #: 11, EX W - Mazza Dep Ex 18 - Agrawal Letter of Intent

to Dismiss); (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to

Motion to Dismiss, Dated: 10/8/2013, Attach #: 9, EX U - Mazza Dep Ex 10 -

Agrawal Dismissal Letter)

Brown's request to appear before the decision maker was denied, and Brown

was never permitted to be heard before any decision-maker. (RI, *Pretrial Order* dated

6/18/2013, docket number 144, at 9-10, SF ¶¶ 37-41.)(UNCONTROVERTED) He

was also afforded none of the other protections guaranteed by either by the proper

procedures or by the School of Law Dispute Resolution Procedure.

No one, including the district court, has ever suggested that Defendants

followed the University's rules and regulations regarding Brown's due process

rights. Clearly, they did not.

**F.    The limitations of the University's Rules and Regulations created a
legitimate claim of entitlement for Brown in his liberty interest in the
due process protections those regulations afford**

Kansas State Law does not permit the University to ignore its own rules. When

a Kansas State Agency violates its own rules, it violates the law. *Murphy v. Nelson*,

260 Kan. 589, 595, 921 P. 2d 1225 (1996)    The University of Kansas admits it is a

State Agency. (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 3, SF

¶2.)(UNCONTROVERTED)

Further, the University Senate has been chartered by the State's constitutionally appointed organization for supervision and control of state universities, the Kansas Board of Regents. And the Kansas Board of Regents has decreed that the University Senate Code and its supporting regulations shall govern the University of Kansas.

The University Senate Code and its supporting regulations are publicly available, as is *Murphy v. Nelson.* Any student, or Kansas citizen for that matter, who is paying attention will readily and reasonably perceive rules and understandings that secure certain benefits, and that give rise to legitimate claims of entitlement. Further, these Kansas agency rules and regulations place sharp limits and restrictions on official discretion in situations involving removal of a student for non-academic reasons, and those restrictions are mandated both by law and by the University's constitutionally appointed governing body. Therefore, the state has created a liberty interest through its laws. "[A] state creates a protected liberty interest by placing substantive limitations on official discretion. These substantive limitations work to create the legitimate claim of entitlement giving rise to a constitutional right." *Montero v. Meyer*, 13 F.3d 1444, 1448 (10th Cir. 1994)(Citations and punctuation omitted)

42

To hold otherwise would perpetrate a fraud of sorts on every citizen of Kansas who places reliance on these administrative regulations which have been made mandatory by the Kansas Supreme Court and by their constitutional protectorate. Such a holding would place the administrative staff of the University of Kansas above the law.

## G.   Relief sought

The ultimate relief sought here is access to a proper hearing within the office of the Vice Provost for Student Success, accompanied by all the protections promised. The immediate relief sought is reversal of summary judgment based upon these grounds.

## III.

**IN THE ALTERNATIVE, IF BROWN IS NOT ENTITLED TO THE PROTECTIONS HERETOFORE DESCRIBED, THE DISTRICT COURT ERRED IN ITS DETERMINATION THAT THE PROCESS PROVIDED WAS CONSTITUTIONALLY SUFFICIENT**

## A.   Legal Standard

43

In *Goss v. Lopez*, 419 US 565 (1975), the Court dealt with a case where a grade school students had been suspended, without a hearing, for periods of ten days or less. The Court stated:

> The Due Process Clause [] forbids arbitrary deprivations of liberty. Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied. School authorities here suspended appellees from school for periods of up to 10 days based on charges of misconduct. If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment. It is apparent that the claimed right of the State to determine unilaterally and without process whether that misconduct has occurred immediately collides with the requirements of the Constitution.

*Id* at 574-75 (Citations and punctuation omitted)

The *Goss* Court went on to require that there be at least an informal hearing between student and disciplinarian, preferably prior to the suspension. *Id* at 584.

The *Goss* Court then further qualified its ruling, stating "We should also make it clear that *we have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures.* Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required." *Id* (Emphasis Added)

There is an impressive body of consensus that any expulsion from a state

university or college must comport with the due process clause of the Fourteenth Amendment. *See* Jones v. Snead, 431 F.2d 1115 (8th Cir. 1970); Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969), cert. den., 398 U.S. 965, 26 L. Ed. 2d 548, 90 S. Ct. 2169 (1970); Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert. den., 368 U.S. 930, 7 L. Ed. 2d 193, 82 S. Ct. 368 (1961); Goss v. Lopez, 419 U.S. 565, 576 n.8, 42 L. Ed. 2d 725, 95 S. Ct. 729, (1975); Wood v. Strickland, 420 U.S. 308, 95 S. Ct. 992, 43 L. Ed. 2d 214, 43 U.S. L.W. 4293, 4298, n. 15 (1975); Edwards v. Board of Regents of Northwest Mo. St. U., 397 F. Supp. 822, 827 (W.D.Mo. 07/8/1975).

It is far too late to argue that a university student in good academic standing is not entitled to a fair hearing before his permanent expulsion from a State University. Brown can find no case in the history of American Jurisprudence where such a dismissal has been upheld by an appellate court, in any jurisdiction, without a hearing. The Goss court has essentially "pre-distinguished" that case so that its minimal procedures would not be mistaken for the more thorough procedures required in the case of a permanent disciplinary expulsion.

But a hearing is not enough. An "impartial decision maker is essential" to comport with due process, even in administrative hearings where a substantial interest is at stake. *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970); *Morrissey v. Brewer*, 408 U.S. 471, 485-486 (1972)

Finally, in determining what type of hearing should take place, we should

consider the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976).    To

undertake this test, we consider three factors:

1. The private interest that be affected by the official action;
2. The risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and;
3. The Government's interest, including the function involved and the fiscal and administrative burdens the additional or substitute procedural requirement would entail.

*Id* at 325

## B.    When the proper balancing test is applied, this case presents much more compelling reasoning for a formal hearing than *Goss*

In Goss, the private interest at stake was a ten day suspension of a public school

student. Nonetheless, the court found that "if sustained and recorded, those charges

could seriously damage the students' standing with their fellow pupils and their teachers

as well as interfere with later opportunities for higher education and employment. It is

apparent that the claimed right of the State to determine unilaterally and without process

whether that misconduct has occurred immediately collides with the requirements of

the Constitution." *Goss*, 419 US 575.

The court found that the risk of erroneous deprivation was "not at all trivial" in a

case of non-academic discipline in a public school, because "[d]isciplinarians []

frequently act on the reports and advice of others; and the controlling facts and the

nature of the conduct under challenge are often disputed." *Id* at 580.

The Goss court then proceeded to prioritize the value of additional procedures

above the burden they created, imposing substantive procedural requirements upon the

school which it had not formally adopted.

Here, by sharp contrast, Brown faces permanent disciplinary expulsion from the

University of Kansas School of Law. And that action will have much more far reaching

consequences than just permanent exclusion from the University of Kansas School of

Law. The School of Law's Honor Code, in part, states that "[p]ermanent expulsion

should be reserved only for the most serious offenses, especially because disciplinary

expulsion of a law student from a member of the Association of the American Law

Schools prevents that student from enrolling in any other member schools." (RI,

*Pretrial Order* dated 6/18/2013, docket number 144, at 13, SF ¶

53.)(UNCONTROVERTED). Put another way, Defendants actions here will result

in Brown's permanent exclusion from any American education institution which

could permit him to sit for the Bar. The net result is permanent, lifetime exclusion from the legal profession.

And, just as in Goss, the risk of erroneous deprivation is "not at all trivial" because the decision making disciplinarian has acted on the reports and advice of others, and the controlling facts and the nature of the conduct under challenge are hotly disputed.

Further, there can be no question that a formal hearing would create an undue administrative burden, because a formal administrative hearing is what the Board of Regents, the University, and the University's governing bodies have already decided is appropriate in this situation. The administrative question here is not "should the administrators be required to undertake additional procedures beyond those already mandated?", but rather "should the administrators be required to comply with what is mandated?" There is no additional burden.

**C.    The district court erred in finding, for the purposes of this motion, that defendant Agrawal was an impartial decision maker**

48

In his brief below, Brown raised several facts indicating that Agrawal's was

biased. Among them were:

1. Agrawal, in a May 31st Email, instructed general counsel to craft Joyce McCray-Pearson's response to Brown's requests for action before the judicial board. In response, general counsel informed Agrawal that they would "formulate a strategy to deal with this issue." A rational fact finder could conclude Agrawal jealously guarded the School of Law's ability to make the determination in Brown's case by assuring that the judicial board would deny jurisdiction. At the very least, she intentionally interfered with the process. (RIV, Docket# 170, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 1, EX AL – EXCERPTS FROM DEFS BATES, doc labeled [Defs.' Bates Brown v. KU - - Revised Redactions 000630])

2. Upon discovery, Defendants confirmed that Brown is the only student who, to their knowledge, has ever been permanently removed from the School of Law for any reason. (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 13, SF ¶ 48.)(UNCONTROVERTED). In this circuit, evidence that the defendant treated the plaintiff differently from others who were similarly situated "is especially relevant to a showing of pretext." Gossett v. State Ex Rel. Board of Regents for Langston Univ., 245 F. 3d 1172, 1177 (10th Cir. 2001); *See* E.E.O.C. v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1195 n.6, 1198-99 (10th Cir. 2000).

3. Agrawal administered Brown's "hearing" via email with carbon copies to defendant Mazza, the main witness against him. (RIV, Docket# 170, *Exhibits in Support of Plaintiff's Response to Motion to Dismiss*, Dated: 10/8/2013, Attach #: 1, EX AL – EXCERPTS FROM DEFS BATES, doc labeled [Defs.' Bates Brown v. KU - - Revised Redactions 000647])

4. Although Agrawal met face to face with witnesses against Brown (RIII, Docket# 168, Exhibits in Support of Plaintiff's Response to Motion to Dismiss, Dated: 10/8/2013, Attach #: 11, EX W - Mazza Dep Ex 18 - Agrawal Letter of Intent to Dismiss), she refused to meet with Brown himself, stating simply "I see no need to meet with you, and therefore decline

49

your request for a meeting." (RI, *Pretrial Order* dated 6/18/2013, docket
number 144,at 13, SF ¶ 41.)(UNCONTROVERTED).

It should also be suspect that Agrawal chose an abbreviated procedure which

was documented nowhere in any University literature and which flew in the face of

established procedural guarantees.

For the purposes of this pleading, Plaintiff's evidence is to be believed. There is

more than enough evidence to convince a rational fact-finder that Agrawal was not

impartial.

## D.     The court erred in finding that the University's failure to follow its own rules did not give rise to a constitutional violation

In its order, the court stated "The law is clear, however, that the failure to follow

its own regulations does not, by itself, give rise to a constitutional violation", citing

*Trotter v. Regents of the Univ. of New Mexico*, 219 F.3d 1179, 1185 (10th Cir. 2000),

*Board of Curators of Univ. of Mo. v. Horowitz*, 435 US 78, 92 n.8 (1978), and

*Schuler v. Univ. of Minn.*, 788 F.2d, 510, 515 (8th Cir. 1986)

None of these cases is on point.  First, they are all cases of failure to meet

academic standards – a circumstance that carries with it no right to a hearing.

In *Trotter*, no copy of the Medical School's process was provided by the

plaintiff, but even so the Medical School had gone beyond what those procedures (as described by the plaintiff) would have provided if they had been followed. The accommodations afforded to Trotter included reversal of the initial dismissal accompanied by a second chance contingent upon academic improvement, neither of which were required by either School process or law. *Id* at 1182.

In *Horowitz*, the referenced note (note 8) makes no claim that a University need not follow its published rules. Rather it explains that the school has followed its own rules, and has even gone above and beyond to provide an additional "appeal" to Horowitz. Note 8 also explains that Horowitz' argument confuses administrative law with constitutional law. This case does not support the proposition advanced by the court.

In *Schuler*, the University of Minnesota initially provided the incorrect process to Schuler based upon a recent change in the University Regulations. When the University discovered its error and offered the correct process, Schuler refused to participate and instead chose to sue immediately. The court questioned Schuler's failure to exhaust his remedies.

None of these cases stand for the proposition that a University may violate its

own rules with impunity. None of these cases deal with a non-academic disciplinary matter and none of them deal with a situation which carried any right to hearing in the first place.

Further, none of these cases deal with Kansas, where failure to follow state agency regulations is unlawful and the Board of Regents is charged with supervision of the Universities by the state constitution.

## E.    Relief sought

The ultimate relief sought here is access to a proper hearing before an impartial factfinder and which comports with the requirements of due process as determined in accordance with the balancing tests of Mathews v. Eldridge. The immediate relief sought is reversal of summary judgment based upon these grounds.

## IV.
## THE DISTRICT ERRED IN LIMITING THE FACTS CONSIDERED TO ONLY UNCONTROVERTED FACTS

## A.    Legal Standard

Under the laws of this circuit, an issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

## B.    Analysis

In its April 18th, Memorandum and Order, the district court dealt with the facts of this case in a way which defies convention, stating "[t]he Court reviewed Plaintiff's purported facts and whether those facts were supported by the record. The Court sets forth below the uncontroverted, material facts that were supported by admissible evidence."

The requirement that facts presented be uncontroverted militates strongly against Brown.

Brown (not an attorney) was pressed with unexpected requirements that related to his occupation during the week his response brief was due, and was not eligible for any further extensions. As such, he ran out of time to consolidate the thoughts he had written in as initial responses to the movant's contentions of fact into something more concise and intelligible. Brown understands the district court's frustration with that portion of his writing, and

further apologizes to the 10th Circuit Court of Appeals to the extent they have to wade through it. Time constraints created a choice of taking that shortcut or abandoning the action entirely.

That said, Brown feels that his additional facts and argument, while by no means perfect, were not similarly afflicted. Brown presented 321 Statements of Additional Fact showing material issues in dispute. The vast majority were properly supported within the record and organized by subject. That should be enough to pass muster with the proper standard of review. The requirement that facts be uncontroverted to be considered is clear error.

By way of example, Brown's Additional Statements of Fact numbered 41 through 44 explained that while misguided, Brown's belief that his prior criminal record was too remote to be included within his application was sincere, genuine, and based upon research and investigation. He also pointed out, again supported by his sworn declaration and Rohleder-Sook's deposition testimony, that he had learned listening to Dean Rohleder-Sook speak that the School of Law did not consider any transgression too remote to include on the application (ASOF 46, Citing his sworn declaration and Rohleer-Sook's Deposition) and that after so learning, he came forth immediately within the first 7 days of his matriculation. (ASOF 50, Citing the Defenandants' Memorandum and his sworn declaration).

None of these claims were supported by hearsay or inadmissible evidence. Rather, they were supported collectively by four references to Brown's sworn declaration, one reference to defendants' bates labeled documents, four references to Brown's deposition testimony, one reference to defendant Rohleder-Sook's testimony, and one reference to admitted facts from defendants' pleadings. Nonetheless, the district court disregarded them entirely.

The district court then treated the question of whether Brown intentionally misled the School of Law as uncontested, stating in its opinion "Indeed, the charges [of intentional falsification and misrepresentation] were true. There is no dispute that Plaintiff lied on his law school application and that he did not disclose his criminal history."

Certainly there is a dispute. This is the most hotly contested claim in the entire case. Brown's argument is that he believed, based on legal research indicating there was a five to seven year window of time before prior criminal acts were too remote to be considered by the bar. Upon learning that the School of Law did not feel that way, he disclosed all his prior convictions immediately. His sworn declaration, his deposition testimony, his writings to the school of law, and the extremely short timeframe between the beginning of his matriculation and the amendment of his application all provide evidence

from which a reasonable finder of fact could find he was mistaken rather than intentionally dishonest. The district court's approach puts Brown at an unconscionable disadvantage.

Further, the space considerations presented in this Court make it impossible to deal with the subject in a comprehensive manner within this pleading.

Presentation of only uncontroverted facts is a highly improper approach which does not comport with the current standard, and is clear error by the district court.

## C. Relief sought

Plaintiff seeks either that the ruling below be overturned and summary judgment denied, or that this action be remanded for treatment of the facts that is consistent with the proper standard.

## V.

## THE DISTRICT COURT ERRED IN MAKING DEFINITIVE FINDINGS OF FACT AT THIS STAGE OF THE PROCEEDINGS WHERE THERE IS EVIDENCE ON THE NON-MOVING PARTY'S SIDE OF THE ISSUE

### A. Legal Standard

The non-moving party "need only present evidence from which a jury might

return a verdict in his favor. If he does so, there is a genuine issue of fact that

requires a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). "The

evidence of the non-movant is to be believed, and all justifiable inferences are to be

drawn in his favor." *Id.* at 255.

### B. The district court erred in making findings of fact which should have been reserved for a jury

The Court in this case found the following:

1.      "There is no dispute that Plaintiff lied on his law school application. . . .

Indeed the charges were true." (RIV, Docket# 188, *Memorandum and Order*, Dated:

4/18/2014, P 20)

Argument – This topic was hotly disputed.  The district court simply ignored

Plaintiff's statements of fact although they were supported by the record, instead

considering only uncontroverted facts.  (RI, Docket# 165, *Plaintiff's Response*, Dated:

10/7/2014, Plaintiff's ASOF ¶¶41-44, 46, 50, pp. 54-56)

2.    "There is no evidence that defendants acted with wantonness." (RIV,

Docket# 188, *Memorandum and Order*, Dated: 4/18/2014, P 21)

Argument – Brown dealt with this assertion in detail in section C of his reponse

entitled ACTIONS INDICATING BAD FAITH AND/OR CONSPIRACY in a four

page section running from pages 122-125.    (RI, Docket# 165, *Plaintiff's Response*,

Dated: 10/7/2014, Plaintiff's ASOF ¶¶208, 215, 214-217, 226, 216, 103-104, 108, 145,

149-150, 157, 165-166, 170-173, 89, 50, 162-163, 158-159, 210-213, 218-223, 227-

228,  230-233, 57, 58, 62, 70-73, 237-240,  208-209, 215, 189, 204, 64, 65, 198, 69,

74-75, 84-88, 154, 156, 112-114, 193-196, 111, 130-131, 167, 134-148, 151-153).

Please refer to the text of the section for an explanation of what each additional

statement of fact proves. The district court simply ignored Plaintiff's statements of fact

although they were supported by the record, instead considering only uncontroverted

facts.

3.    "Plaintiff cannot demonstrate a reasonable expectancy in practicing law.

He also cannot demonstrate that but for the conduct of Defendants, he was reasonably certain to have realized this expectancy." (RIV, Docket# 188, *Memorandum and Order*, Dated: 4/18/2014, P 22)

Argument – Plaintiff did provide evidence regarding his expectancy in practicing law and his prospects of realizing it. The district court simply ignored Plaintiff's statements of fact although they were supported by the record, instead considering only uncontroverted facts. (RI, Docket# 165, *Plaintiff's Response*, Dated: 10/7/2014, Plaintiff's ASOF ¶315-317, pp. 114-115)

4.      "[Plaintiff] cannot demonstrate intentional misconduct, or malice, by Defendants." (RIV, Docket# 188, *Memorandum and Order*, Dated: 4/18/2014, P 22)

Argument – Brown dealt with this assertion in detail in section C of his reponse entitled ACTIONS INDICATING BAD FAITH AND/OR CONSPIRACY in a four page section running from pages 122-125.   (RI, Docket# 165, *Plaintiff's Response*, Dated: 10/7/2014, Plaintiff's ASOF ¶¶208, 215, 214-217, 226, 216, 103-104, 108, 145, 149-150, 157, 165-166, 170-173, 89, 50, 162-163, 158-159, 210-213, 218-223, 227-228, 230-233, 57, 58, 62, 70-73, 237-240, 208-209, 215, 189, 204, 64, 65, 198, 69, 74-75, 84-88, 154, 156, 112-114, 193-196, 111, 130-131, 167, 134-148, 151-153).

Please refer to the text of the section for an explanation of what each additional statement of fact proves. The district court simply ignored Plaintiff's statements of fact although they were supported by the record, instead considering only uncontroverted facts.

5.    "There is no evidence of unlawful overt acts or evidence of a meeting of the minds."

Argument – Brown dealt with this assertion in detail in section C of his reponse entitled ACTIONS INDICATING BAD FAITH AND/OR CONSPIRACY in a four page section running from pages 122-125.   (RI, Docket# 165, *Plaintiff's Response*, Dated: 10/7/2014, Plaintiff's ASOF ¶¶208, 215, 214-217, 226, 216, 103-104, 108, 145, 149-150, 157, 165-166, 170-173, 89, 50, 162-163, 158-159, 210-213, 218-223, 227-228, 230-233, 57, 58, 62, 70-73, 237-240, 208-209, 215, 189, 204, 64, 65, 198, 69, 74-75, 84-88, 154, 156, 112-114, 193-196, 111, 130-131, 167, 134-148, 151-153). Please refer to the text of the section for an explanation of what each additional statement of fact proves. The district court simply ignored Plaintiff's statements of fact although they were supported by the record, instead considering only uncontroverted facts.

The district court simply disregarded Brown's statements of fact. This is clear error.

## C.    Relief sought

Plaintiff seeks either that that ruling below be overturned and summary judgment denied, that this action be remanded for treatment of the facts that is consistent with the proper standard, or that this Court consider the facts originally pled in Brown's response when assessing the district courts findings of fact based upon no evidence.

## VI.
# THE DISTRICT COURT'S DISMISSAL OF THE BOARD OF REGENTS FROM THIS ACTION WAS IMPROPER

## A.    Legal Standard

In Kansas, the Regents' involvement in cases such as this is both contemplated and provided for by statute. K.S.A. 76-713 provides that "The board of regents may be sued and may defend any action brought against the board of regents or any state

educational institution."

## B.    Analysis

The defendants argue, and the district court agrees, that the Kansas Board of Regents cannot be a proper defendant because they had no knowledge of the transgressions which occurred below within the University. In support of this claim, Defendants cite case law which shows that Brown my not pursue the Regents under the doctrine of *respondeat superior*.

But the Board of Regents is named only as an official capacity defendant. No damages are sought from the Regents either individually or as a Board. Brown's claims include claims for prospective injunctive relief pursuant to the doctrine of Ex Parte Young and a state claim for similar relief pursuant to K.S.A. 60-902. (RI, *Pretrial Order* dated 6/18/2013, docket number 144, at 41.)

The Regents' involvement in such cases is contemplated by statute. Brown wants to be sure that whatever equitable Judgment may be forthcoming is not inoperative for want of the proper power to implement that judgment. The involvement of the Board of Regents assures that appropriate resources will be brought to bear.

The court erred in dismissing the Board of Regents as a Defendant.

## B.    Relief Sought

Plaintiff prays that the Board of Regents be reinstated as a defendant.

## CONCLUSION

Plaintiff prays that this court reverse the district court's order of summary judgment, or for other relief as herein requested.

Dated: June 30, 2014          **ROBERT M. BROWN**

By:

Robert M. Brown

*Appellant Pro Se*

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

:              this brief contains 13,631 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

Q              this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

:              this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font using the Times New Roman type style, *or*

this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

By:

Robert M. Brown

Appellant
Dated: June 30, 2014

## PROOF OF SERVICE

I, **Robert M. Brown**, declare as follows:

I am the Plaintiff/Appellant in 10th Circuity Court of Appeals Case No. 14-3102. On **June 30, 2014**, I served the within document entitled:

## APPELLANTS' OPENING BRIEF

on the parties in the action by placing a true copy thereof addressed as follows and delivering in the below-stated manner:

Parties Served:

## SEE ATTACHED MAILING LIST

[/] (BY MAIL) by placing a true copy thereof in an envelope addressed as indicated on the attached service list.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Overland Park, KS.

_____

Robert M. Brown, Plaintiff/Appellant

## MAILING LIST FOR PROOF OF SERICE

(Brown v. University of Kansas et. al.)
(Tenth Circuit Case No: 14-3102)

| PARTY / INDIVIDUAL SERVED | PARTY REPRESENTED / CAPACITY |
|---|---|
| Sarah L. Trower<br>245 Strong Hall<br>1450 Jayhawk Blvd.<br>Lawrence, KS 66045<br>785-864-3276<br>strower@ku.edu | All Defendants<br><br>2 COPIES BY U.S. MAIL |